351 F.3d 1139
 ULEAD SYSTEMS, INC. (a California Corporation), Plaintiff-Cross Appellant, and
Ulead Systems, Inc. (a Taiwan Corporation), Cross Defendant-Cross Appellant,
v.
LEX COMPUTER & MANAGEMENT CORP., Defendant/Cross Claimant-Appellant.
 No. 01-1320.
 No. 01-1402.
 No. 01-1448.
 United States Court of Appeals, Federal Circuit.
 Decided December 9, 2003.
 
 COPYRIGHT MATERIAL OMITTED Kenneth L. Wilton, Small Larkin, LLP, of Los Angeles, California, argued for plaintiff-cross appellant and cross defendant-cross appellant. With him on the brief were Jon E. Hokanson and Jill S. Schwartz.
 William J. Brutocao, Sheldon & Mak, of Pasadena, California, argued for defendant/cross claimant-appellant. With him on the brief was Jeffrey G. Sheldon.
 Before NEWMAN, DYK and PROST, Circuit Judges.
 Opinion for the court filed by Circuit Judge DYK. Concurring in part and dissenting in part opinion filed by Judge NEWMAN.
 DYK, Circuit Judge.
 
 
 1
 Lex Computer & Management Corp. ("Lex") appeals the decision of the United States District Court for the Central District of California, granting summary judgment that United States Patent No. 4,538,188 ("the '188 patent") is unenforceable and expired because Lex falsely claimed status (and paid maintenance fees) as a small entity. Lex also appeals the district court's award of attorneys' fees under 35 U.S.C. § 285 to Ulead Systems, Inc., a California corporation, ("Ulead-California") and Ulead Systems, Inc., a Taiwan corporation ("Ulead-Taiwan"). Ulead-California and Ulead-Taiwan cross-appeal claiming that they should have been awarded additional attorneys' and expert witness fees.
 
 
 2
 We conclude that summary judgment of inequitable conduct was improper because a genuine dispute of material fact remains as to Lex's intent to deceive. We also hold that the erroneous payment of small entity fees may be excused under 37 C.F.R. § 1.28(c), so long as the patentee is not guilty of inequitable conduct relating to its inaccurate assertion of small entity status. Consequently, we vacate the decision of the district court, including the award of attorneys' fees, and remand for trial. On the cross appeal we affirm the district court's refusal to impose sanctions based on Lex's alleged failure to conduct a pre-filing investigation and dismiss as moot the cross-appeal in other respects.
 
 BACKGROUND
 
 3
 In 1980, Congress amended the patent laws to require for the first time the payment of periodic maintenance fees to maintain the life of a patent. Act of December 12, 1980, Pub. L. No. 96-517, § 2, 1980 U.S.C.C.A.N. (94 Stat.) 3015, 3017-18 (codified as amended at 35 U.S.C. § 41 (2000)). Further amendments in 1982 imposed substantial increases in filing, processing, maintenance and issue fees. Concerned that this new legislation would be overly burdensome to individuals, nonprofit organizations and smaller businesses, Congress provided a discount for small entities. Act of August 27, 1982, Pub. L. No. 97-247, § 1, 1982 U.S.C.C.A.N. (96 Stat.) 317, 317. This discount for small entities was eventually made permanent. Act of Nov. 6, 1986, Pub. L. No. 99-607, § 1(b)(2), 1986 U.S.C.C.A.N. (100 Stat.) 3470, 3470 (codified as amended at 35 U.S.C. § 41(h) (2000)). Pursuant to its rulemaking authority under 35 U.S.C. § 41, the Patent and Trademark Office ("the PTO") adopted rules governing claims to small entity status. 47 Fed.Reg. 40,134, 40,139-40 (Sept. 10, 1982) (codified as amended at 37 C.F.R. §§ 1.27, 1.28 (1983)).
 
 
 4
 The PTO rules define a "small entity" as a small business concern, independent inventor, or non-profit organization. 37 C.F.R. § 1.9(f) (1993).[1] "Small business concern" is defined in accordance with the definition established by the Small Business Administration ("SBA"). Id. at § 1.9(d). The applicable SBA regulation states as follows:
 
 
 5
 a small business concern for purposes of paying reduced fees ... to the Patent and Trademark Office means any business concern (1) whose number of employees, including those of its affiliates, does not exceed 500 persons and (2) which has not assigned, granted, conveyed, or licensed, and is under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who could not be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section.
 
 
 6
 37 C.F.R. § 1.9(d) (quoting 13 C.F.R. § 121.12(a)) (emphases added).
 
 
 7
 In the present case, it is undisputed that Lex has never had more than twenty employees and qualified as a small entity when it acquired the '188 patent by assignment on May 21, 1986. Lex properly paid the first maintenance fee on the '188 patent at the reduced rate in 1988. However, on February 15, 1993, Lex granted a nonexclusive license to Adobe Systems Incorporated ("Adobe"), a company with more than 500 employees, and later granted non-exclusive licenses to at least two more large entities.
 
 
 8
 It is undisputed that the grant of the Adobe license and the other licenses to large entities disqualified Lex from claiming small entity status and paying reduced fees. It is also undisputed that on November 1, 1993, Lex submitted the second maintenance fee for the '188 patent to the PTO along with a petition to accept delayed payment and a verified statement claiming small entity status. The verified statement stated: "no rights to the invention are held by any person ... who could not qualify as a small business concern under 37 CFR 1.9(d)." (App. at 523.) The PTO granted the petition and reinstated the patent on November 15, 1993. On September 28, 1998, Lex submitted a petition to accept delayed payment of its third maintenance fee. That petition stated that "small entity status for this patent has been checked and is still in effect." (App. at 525.) The PTO granted the petition and again reinstated the '188 patent on April 26, 1999. Lex admits that it paid both the second and third maintenance fees and claimed the reduced rate for small entities even though it was not entitled to claim small entity status.
 
 
 9
 On July 21, 1998, Ulead-California filed this action seeking declaratory judgment of non-infringement, invalidity, and unenforceability of the '188 patent. Lex counterclaimed for infringement of the '188 patent. Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp., 130 F.Supp.2d 1137, 1141 (C.D.Cal.2001) ("Ulead I"). Lex later joined Ulead-Taiwan and filed a cross-claim for infringement of the '188 patent. Id. On December 26 and 28 of 2000, Ulead-California and Ulead-Taiwan respectively moved for summary judgment that the '188 patent is unenforceable, invalid and/or expired.[2] Id. Ulead set forth two grounds in these motions: (1) that the '188 patent is unenforceable and/or invalid because of Lex's misrepresentations of small entity status to the PTO and (2) that the '188 patent had expired because Lex failed to pay the correct maintenance fees and did not pay the incorrect small entity fee in "good faith" as required by the PTO regulation. See Id. at 1142. Immediately thereafter, Lex acted to correct the error in fee payment by submitting the balance of the deficiency to the PTO, in accordance with the procedures for correcting erroneous underpayment set forth in 37 C.F.R. § 1.28(c). The PTO accepted payment, and on January 5, 2001, announced by letter that "[a]fter meeting with the Office of Petitions it was determined that [Lex's] request to change status to large entity under patent number 4,538,188 will be approved." (App. at 1650.)
 
 
 10
 Lex opposed summary judgment on the ground that it did not intend to mislead the PTO to believe it was entitled to small entity status. Lex also argued that the '188 patent was not expired because the PTO had properly excused its erroneous claim to small entity status (and underpayment of fees) under § 1.28(c). On January 23, 2001, the district court granted summary judgment for Ulead on both of the asserted grounds. The court held that the patent was unenforceable because Lex had committed inequitable conduct and there was no genuine issue of fact relating to either the materiality of Lex's misrepresentation of small entity status or its intent to deceive. Id. at 1143-46. The court also held that the patent had expired due to failure to pay the full maintenance fees and that Lex could not correct this error under § 1.28(c) because its claim to small entity status had been in bad faith. Id. at 1147.
 
 
 11
 Based upon its conclusion that Ulead had proven, by clear and convincing evidence, that Lex was guilty of inequitable conduct and bad faith, the district court held this to be exceptional case under 35 U.S.C. § 285. Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp., 151 F.Supp.2d 1192, 1205 (C.D.Cal.2001) ("Ulead II"). Ulead was awarded attorneys' fees and costs in the amount of $470,084.37. Id. at 1215. However, the court refused to award attorneys' fees incurred for a related litigation that Lex had filed against Ulead in New York. Id. at 1211. Ulead was also denied deposition-related expert witness fees, id. at 1213, and attorneys' fees that it spent to prepare additional summary judgment motions of invalidity and non-infringement that were not considered by the district court, id. at 1211. Furthermore, the court declined to impose sanctions for Lex's alleged vexatious litigation and failure to conduct a pre-filing investigation. Id. at 1213-14.
 
 
 12
 Lex timely appealed. Ulead timely cross-appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
 
 DISCUSSION
 
 13
 "Summary judgment is proper in a case where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." DH Tech., Inc. v. Synergystex Int'l, Inc., 154 F.3d 1333, 1339 (Fed.Cir.1998). We review a district court's grant of summary judgment without deference. Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1362 (Fed.Cir.2003).
 
 
 14
 * This case presents significant questions concerning the standards for rendering patents unenforceable for misconduct before the PTO in connection with claims of small entity status.
 
 
 15
 Under our precedent, inequitable conduct rendering a patent unenforceable arises when there is "evidence of affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." Dayco, 329 F.3d at 1362 (quoting Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1366 (Fed.Cir.2001)); see also Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed.Cir. 1988). After threshold findings of materiality and intent have been established by clear and convincing evidence, the court must weigh them to determine if equity warrants a finding of inequitable conduct. Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995). Thus, "inequitable conduct is a broader, more inclusive concept than ... common law fraud." Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1069 (Fed.Cir.1998).
 
 
 16
 A finding of ... fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct. Moreover, unlike a finding of inequitable conduct, a finding of... fraud may not be based upon an equitable balancing of lesser degrees of materiality and intent. Rather, it must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance.
 
 
 17
 Id. at 1070-71 (citation omitted). Historically issues of unenforceability have arisen in cases involving inequitable conduct occurring in the prosecution of patents. See, e.g., Purdue, 237 F.3d 1359; Kingsdown, 863 F.2d 867. But, we see no reason why the doctrine should not extend into other contexts, like the present one, where the allegation is that inequitable conduct has occurred after the patent has issued and during the course of establishing and paying the appropriate maintenance fee. In this context, it is equally important that the PTO receive accurate information from those who practice before it.
 
 II
 
 18
 However, at the outset, we must determine whether the applicable PTO rule was designed to establish a different standard than our traditional standard for inequitable conduct. We conclude that it was not, and thus, do not need to decide whether our standard or the standard in the PTO rule should prevail in the event of a conflict. See Dayco, 329 F.3d at 1364.
 
 
 19
 From the origin of the small entity system, the PTO has been concerned that small entity status might be abused by unqualified entities. Its initial regulations addressed this problem, warning that:
 
 
 20
 (d)(1) Any attempt to fraudulently (i) establish status as a small entity or (ii) pay fees as a small entity shall be considered as a fraud practiced or attempted on the Office.
 
 
 21
 (2) Improperly and through gross negligence (i) establishing status as a small entity or (ii) paying fees as a small entity shall be considered as a fraud practiced or attempted on the Office. See §§ 1.56(d) and 1.555 of this part.
 
 
 22
 37 C.F.R. § 1.28(d) (1983) (emphases added). In promulgating this rule, the PTO announced that this provision was "strictly limited" to fraudulent or grossly negligent conduct. 47 Fed. Reg. at 40,138.
 
 
 23
 As originally drafted, the PTO standard was plainly not the same as the standard we have adopted for inequitable conduct. In particular, the rule stated that "gross negligence" would amount to "a fraud practiced ... on the Office." 37 C.F.R. § 1.28(d) (1983). Our cases, in contrast, have made clear that a finding of gross negligence does not, by itself, establish the intent threshold. See, e.g., Kingsdown, 863 F.2d at 876 (en banc in relevant part). In Kingsdown, the district court inferred intent to deceive based on the applicant's grossly negligent conduct. Id. at 873. We reversed and explained that "a finding that particular conduct amounts to `gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Id. at 876 (en banc in relevant part).
 
 
 24
 However, the PTO amended its rule in 1992, and the conduct at issue in this case occurred after the amendment. The rule was amended to delete the references to gross negligence and read as follows:
 
 
 25
 (d)(1) Any attempt to fraudulently (i) establish status as a small entity or (ii) pay fees as a small entity shall be considered as a fraud practiced or attempted on the Office.
 
 
 26
 (2) Improperly and with intent to deceive
 
 
 27
 (i) establishing status as a small entity, or
 
 
 28
 (ii) paying fees as a small entity shall be considered as a fraud practiced or attempted on the Office.
 
 
 29
 37 C.F.R. § 1.28(d) (1993) (emphasis added).[3] The PTO explained its intent behind this amendment stating that:
 
 
 30
 Proposed § 1.28(d)(2) retains the reference to fraud practiced or attempted on the Office, but removes any reference to sections which currently provide for rejections based on fraud. Further, the reference to "gross negligence" is proposed to be replaced by references to "intent to deceive" to reflect binding precedent of the U.S. Court of Appeals for the Federal Circuit. See, e.g., Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 9 USPQ 2d 1384 (Fed.Cir.1988) (en banc). 56 Fed. Reg. 37,321, 37,323 (Aug. 6, 1991). As noted above, Kingsdown discarded the notion that gross negligence alone satisfies the intent to deceive threshold for inequitable conduct. 863 F.2d at 876 (en banc in relevant part); see also Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329 (Fed. Cir.1998); Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1439 n. 3 (Fed.Cir.1991). Thus, the PTO's amendment removed any inconsistencies with our inequitable conduct precedent. We hold that our traditional standard for inequitable conduct is applicable to PTO proceedings involving the payment of maintenance fees as a small entity-and that a threshold determination of both materiality and intent and a balancing of the two are required. The burden is on the party asserting inequitable conduct to establish it by "clear and convincing evidence." Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed.Cir. 2003).
 
 III
 
 31
 There is no serious question here as to materiality, as the district court found. In its reply brief, Lex challenges Ulead's argument that the false declaration of small entity status was material, arguing that Lex's misrepresentation had "no bearing on patentability." (Def.-Appellant Reply Br. at 11.) While Lex is correct that the affidavit did not induce issuance of the patent, the misrepresentation that Lex qualified as a small entity was material to the PTO's acceptance of reduced maintenance fees, and thus, survival of the patent. As such, at least a threshold level of materiality has been established as a matter of law. See Gen. Electro Music Corp. v. Samick Music Corp., 19 F.3d 1405, 1411 (Fed.Cir.1994) ("[T]here is no room to argue that submission of false affidavits is not material.") (quoting Rohm & Haas Co. v. Crystal Chem. Co., 722 F.2d 1556, 1561 (Fed.Cir. 1983)); Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1193 (Fed.Cir.1993) (explaining that concealment of information uniquely in the applicant's possession is particularly egregious because the PTO has no way of securing this information on its own).
 
 
 32
 There are, however, genuine issues of material fact as to intent. "To satisfy the intent to deceive element of inequitable conduct, `the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" Paragon, 984 F.2d at 1189 (quoting Kingsdown, 863 F.2d at 876 (en banc in relevant part)). Direct evidence of deceptive intent is not required; rather it is usually inferred from the patentee's overall conduct. Id. at 1189-90. Although inequitable conduct is a matter for the court, rather than the jury to resolve, summary judgment is inappropriate if there are genuine issues of material fact. Id. at 1190.
 
 
 33
 Lex admits that it was not entitled to small entity status when it filed its affidavit of small entity status and paid reduced fees in 1993 and 1997. But, it claims that these were innocent errors and that it was grossly negligent at worst, and that it did not have an intent to deceive. To support this argument, Lex cites the deposition of its president, Mr. Haberman, who testified that he was unaware that Lex was not a small entity when he signed the 1993 verified statement claiming small entity status (the "1993 declaration"). Lex also refers to the declaration of its patent counsel, Mr. Weiner, who stated that although he was aware of the PTO rule in question, he was unaware of the existence of the licenses that caused the loss of small entity status. Ulead I, 130 F.Supp.2d at 1145-46. Ulead argues that Lex remained intentionally ignorant of the law and that Lex's false statements to the PTO support an inference of intent to deceive. The district court agreed with Ulead; it rejected the testimony offered by Lex as "self-serving and inconsistent with the documentary evidence," and it found that the circumstantial evidence was sufficient to establish intent on summary judgment. Ulead I, 130 F.Supp.2d at 1146. We conclude that the evidence before the district court raises genuine issues on the question of intent.
 
 A.
 Haberman's Testimony
 
 34
 Mr. Haberman testified that, while he was aware of the language of the declaration, he was not aware that a non-exclusive license to a large entity would result in a loss of the licensor's small entity status. Mr. Haberman is a lawyer. The district court relied on the fact that Haberman, while primarily a real estate lawyer, had taken patent law review courses and twice sat unsuccessfully for the patent bar examination, and on the language of the 1993 declaration, along with Haberman's admission that Lex's licensees had "rights" in the '188 patent, to discredit this testimony. Ulead I, 130 F.Supp.2d at 1145. However, there was no evidence that Haberman had studied the law concerning small entity status or the language of the regulation itself prior to signing the 1993 declaration.
 
 
 35
 Moreover, the language of the form declaration itself does not unambiguously notify the reader that granting a non-exclusive license to a large entity will result in forfeiture of small entity status. The 1993 declaration stated:
 
 
 36
 If the rights held by the above identified small business concern are not exclusive, each individual, concern or organization having rights to the invention is listed below and no rights to the invention are held by any person ... who could not qualify as a small business concern under 37 CFR 1.9(d).[4]
 
 
 37
 (App. at 523 (footnote omitted).) The 1993 declaration refers to "rights to the invention," but unlike the regulations does not refer to licensing. See 37 C.F.R. § 1.9(d) (quoting 13 C.F.R. § 121.12(a)). "It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent." In re CFLC, Inc., 89 F.3d 673, 679 (9th Cir.1996) (quoting Gilson v. Republic of Ireland, 787 F.2d 655, 658 (D.C.Cir.1986)). Here, drawing all reasonable inferences in Lex's favor, the declaration could be construed to refer only to the proprietary rights that remained exclusively owned by Lex.
 
 
 38
 Mr. Haberman's testimony is consistent with this interpretation of the 1993 declaration. Haberman testified that the language of the affidavit required disclosure of any other entities with ownership rights in the '188 patent, but not non-exclusive licensees who only had rights to use the invention. Haberman's testimony that he was unaware that a non-exclusive license could result in forfeiture of small entity status, in light of the ambiguous language of the form declaration, is sufficient to create a genuine issue as to Lex's intent.
 
 B. Weiner's Declaration
 
 39
 Lex's patent counsel, Mr. Weiner, also testified that he did not intend to deceive the PTO. (App. at 1646.) Lex admits that Weiner understood the law. However, it argues that Weiner was unaware, until after Ulead raised the issue in this case, that Lex had entered into any licenses with companies having more than 500 employees. Id. In his declaration, Mr. Weiner explained that he did not directly represent Lex in acquiring any of its licenses and, as a result, was unaware that Lex had finalized license agreements with any companies having more than 500 employees. (App. at 1644.) The district court discounted this declaration because of Weiner's statement that he had "checked" the small entity status and it was still in effect. Ulead I, 130 F.Supp.2d at 1146. The court found that "either Mr. Weiner did not ask the right questions or he was not provided the right answers." Id. But this assessment is more telling of negligence then any actual intent to deceive. If Mr. Weiner was truly ignorant of the facts, as his declaration states, then his testimony raises a genuine issue for trial.
 
 
 40
 On summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1575-76 (Fed.Cir.1994). The district court did not do that here. Mr. Haberman and Mr. Weiner's testimony that they were unaware of Lex's loss of small entity status creates an issue of fact. Their testimony is not merely conclusory. Moreover, it is supported by the fact that the amount of money Lex saved by paying maintenance fees as a small entity was relatively miniscule in comparison to the value of the '188 patent.[5] The mere fact that no action to correct the mistake was taken prior to the commencement of this litigation is simply beside the point if Lex was previously unaware of the mistake. The existence of gross negligence might be inferred from the undisputed facts, but as the district court recognized, gross negligence is not, in and of itself, sufficient to satisfy the intent element of inequitable conduct.[6] E.g. Ulead I, 130 F.Supp.2d at 1144; Baxter, 149 F.3d at 1329; Kingsdown, 863 F.2d at 876 (en banc in relevant part). In a particular case, the question of whether an inference of actual intent can be supported by evidence of gross negligence and other evidence can only be determined after a hearing at which the credibility of the witnesses is assessed. A trial on the issue of intent is required, and if a threshold level is found, the district court must balance materiality and intent to determine if Lex has committed inequitable conduct.
 
 IV
 
 41
 The district court in this case granted summary judgment on the alternate ground that the '188 patent expired for failure to pay maintenance fees. It reasoned that section 1.28(c) allows the PTO to excuse the erroneous establishment of small entity status or payment of small entity fees only if these actions were taken in good faith. Ulead I, 130 F.Supp.2d at 1147; see 37 C.F.R. § 1.28(c) (2001). Although the PTO accepted Lex's payment of the maintenance fee deficiency, the district court concluded that Lex's original claim of small entity status and its payment of reduced-maintenance fees were in bad faith. Ulead I, 130 F.Supp.2d at 1147. We hold that the district court properly held that section 1.28(c) governs, but that it has misunderstood the applicable regulation.
 
 
 42
 In DH Technology, we held that the statute and regulations barring reinstatement of a patent for failure to timely pay issuance fees within the allowed grace period do not apply to underpayments resulting from erroneous claims of small entity status. 154 F.3d at 1342. Rather, we held that when a party inaccurately claims small entity status, the question of whether a patent has expired for failure to pay the full issuance fee is exclusively governed by section 1.28(c). Id. We see no basis for distinguishing the provisions dealing with the payment of maintenance fees, namely 35 U.S.C. § 41 and 37 C.F.R. § 1.378, from those involving payment of issuance fees. Indeed, the MPEP specifically indicates that section 1.28(c) governs when maintenance fees are improperly paid as a small entity. MPEP § 509.03, at 500-42 (8th ed. 2001) ("A maintenance fee improperly paid as a small entity where small entity status has been established but is no longer appropriate will be treated as a matter under 37 CFR § 1.28(c) and will not be considered to involve expiration of the patent under 37 CFR § 1.378."). As with issuance fees, the sole provision governing expiration for failure to pay the full maintenance fee because of an erroneous claim to small entity status is section 1.28(c) of the regulations.
 
 
 43
 However, we conclude that section 1.28(c) does not authorize or require an inquiry into good faith. The regulation in effect at the time Lex sought to correct its erroneous payment of small entity maintenance fees provided that:
 
 
 44
 If status as a small entity is established in good faith, and fees as a small entity are paid in good faith, in any application or patent, and it is later discovered that such status as a small entity was established in error, or that through error the Office was not notified of a loss of entitlement to small entity status as required by 1.27(g)(2), the error will be excused upon: compliance with the separate submission and itemization requirements of paragraphs (c)(1) and (c)(2) of this section, and the deficiency payment requirement of paragraph (c)(2) of this section.
 
 
 45
 37 C.F.R. § 1.28(c) (2001) (emphases added). The PTO views the submission of "[a] fee deficiency payment under § 1.28(c) ... as a representation by the party submitting the payment that small entity status was established in good faith and that the original payment of small entity fees was made in good faith." 62 Fed. Reg. 53,132, 53,135 (Oct. 10, 1997) (emphasis added). However, the PTO does not view the regulation as obligating it to conduct, and in fact does not conduct, inquiries into whether the patentee has satisfied the good faith error standard. Id.; see also Abraham Hershkovitz, Petitions Practice Within the Patent and Trademark Office on Patent Matters, 80 J. Pat. & Trademark Off. Soc'y 171, 180 (March 1998) ("As an explanation of the error in the original payment is no longer necessary, any paper submitted under § 1.28(c) will be placed in the file without review.").[7] In other words, the PTO does not view section 1.28(c) as requiring it to make an inquiry into the patentee's good faith as a condition to accepting the late payment. Under such circumstances there is no basis to construe the regulation as mandating such an inquiry by the district court in order to determine whether the patent has expired, and we hold that a district court has no such obligation or authority. The submission of the deficiency fee payment, when accepted by the PTO, is effective to correct the patentee's error.
 
 
 46
 To be sure, if the patentee makes a request to correct incorrect payment of fees as a small entity knowing that it does not satisfy the good faith error standard of section 1.28(c), the patentee may be found to have engaged in inequitable conduct. We addressed this very issue in DH Technology. While the language of that opinion refers to a determination of the patentee's "good faith" by the district court, we made clear that the only pertinent inquiry is "whether [the patentee] fraudulently established status as a small entity or fraudulently paid the small entity issue fee." DH Technology, 154 F.3d at 1343.
 
 
 47
 Thus, the question here is whether Lex committed inequitable conduct by knowingly misrepresenting that it was entitled to have the error excused under section 1.28(c). Ulead, of course, bears the burden of establishing inequitable conduct by clear and convincing evidence. Here, as explained above, this burden has not been met on summary judgment because genuine issues of fact remain as to intent.
 
 CONCLUSION
 
 48
 For the foregoing reasons, we vacate the district court's grant of summary judgment of unenforceability, invalidity and/or expiration of the '188 patent because there are genuine issues of material fact remaining as to intent.[8] We remand for further consideration of the issue of inequitable conduct and the remaining issues of invalidty and infringement. Having vacated on the merits, we also vacate the district court's finding of exceptional case and award of attorneys' fees. On the cross-appeal, we affirm the district court's denial of sanctions for failure to conduct a pre-filing investigation. Ulead agrees that, in this case, sanctions cannot be imposed under Rule 11 of the Federal Rules of Civil Procedure, and we decline to impose a special, pre-filing investigation requirement independent of Rule 11. Ulead has not appealed the district court's refusal to award fees for alleged vexatious litigation. We dismiss as moot the remainder of the cross-appeal since the district court's finding of inequitable conduct has been vacated.
 
 
 49
 
 VACATED AND REMANDED.
 
 
 COSTS
 
 50
 No costs.
 
 
 
 Notes:
 
 
 [1]
 The 1993 versions of 37 C.F.R. §§ 1.9 and 1.28(d) and 13 C.F.R. § 121.12 are applicable to the issue of Lex's erroneous claim of small entity status that was first made in November of 1993. The 2001 version of 37 C.F.R. § 1.28(c) applies to the expiration issue and the repayment of deficient maintenance fees because the petition to correct status was filed in December of 2000. Citations herein are to the pertinent versions of the regulations
 
 
 [2]
 Since the motions for summary judgment were jointly filed and substantively identical, the opinion, from this point onward, will collectively refer to Ulead-California and Ulead-Taiwan as "Ulead."
 
 
 [3]
 The text of section 1.28(d) was moved to section 1.27(h) in 2000; that provision remains identical to the 1993 versionSee 37 C.F.R. § 1.27(h) (2002).
 
 
 [4]
 This language is essentially identical to that of the form "Verified Statement Claiming Small Entity Status" appearing in the Manual of Patent Examining Procedure ("MPEP") when Lex filed the 1993 declarationSee MPEP § 509.03 at 500-16 (5th ed., rev. 15 1993).
 
 
 [5]
 Lex saved $2,515 by paying small entity second and third maintenance fees for the '188 patent, and approximately $14,000 in maintenance fees on its entire patent portfolio. Reply Br. for Def.-Appellant at 4. For comparison, Lex received $600,000 from licensing its patents to Adobe and has earned several million dollars in royalties from its other licenses
 
 
 [6]
 Curiously, in its opinion on sanctions, the district court appears to have found intent based on its finding that Lex's conduct was grossly negligent or willfully blind, relying on our opinion inReactive Metals and Alloys Corp. v. ESM, Inc., 769 F.2d 1578 (Fed.Cir. 1985), as holding that "gross negligence is sufficient." Ulead II, 151 F.Supp.2d at 1204-05. To the extent that Reactive suggested that a finding of gross negligence standing alone is sufficient to satisfy the intent prong of inequitable conduct, it has been overruled by the en banc portion of our decision in Kingsdown, 863 F.2d at 876 (en banc in relevant part).
 
 
 [7]
 The PTO continues to make the article available on its website as an explanation of PTO petitions practiceSee http://www.uspto.gov/web/offices/pac/dapp/ opla/petprac.pdf.
 
 
 [8]
 The district court found the '188 patent "unenforceable and/or invalid" based upon inequitable conductUlead, 130 F.Supp.2d at 1142, 1146. Although the practical effect is generally the same, inequitable conduct renders a patent unenforceable rather than invalid. Minn. Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1569 (Fed.Cir.1992). Thus, there was no basis for granting summary judgment of invalidity because of inequitable conduct.
 
 
 
 51
 PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.
 
 
 52
 I write to state my concerned objection to the court's conversion of the regulatory criterion of "fraud" into the rejected substitute "inequitable conduct." The underpayment of a fee is not a matter of "inequitable conduct" in obtaining a patent to which one is not entitled, with the penalty of permanent loss of the wrongfully obtained patent. The regulation herein is explicit in requiring the more rigorous proof of "fraud" in establishing a false claim of entitlement to reduced fees. My colleagues on this panel now change this criterion to the more readily met "inequitable conduct," negating the regulations and ignoring the deference appropriate to the PTO Director's administration. As the panel majority recognizes, "inequitable conduct is a broader, more inclusive concept than ... common law fraud." Maj. op. at 1144. The difference between these causes was explained in Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059 (Fed.Cir.1998):
 
 
 53
 A finding of Walker Process fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct. Moreover, unlike a finding of inequitable conduct, a finding of Walker Process fraud may not be based upon an equitable balancing of lesser degrees of materiality and intent. Rather, it must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance.
 
 
 54
 Id. at 1070-71. The panel majority's holding that inequitable conduct is simply fraud in other words, is contrary to law and precedent. As discussed in Consolidated Aluminum Corp. v. Foseco International Ltd., 910 F.2d 804, 812 (Fed.Cir. 1990), "what we have termed `inequitable conduct' is no more than the unclean hands doctrine applied to particular conduct before the PTO." It is hornbook law that unclean hands and fraud are different wrongs, subject to different criteria.
 
 
 55
 The court now negates the Regulation, 37 C.F.R. § 1.28(d) (now at § 1.27(h)), which describes the legal status of a fraudulent claim to small entity status as "a fraud practiced or attempted on the Office." Reference to the inequitable conduct rule had previously been dropped from the regulation. The panel majority states that it "need not decide" whether to apply "our standard" or "the standard in the PTO rule." Maj. op. at 1145. Our authority, however, does not extend to rewriting agency regulations. From this departure from law, precedent, and administrative practice, I respectfully dissent.
 
 DISCUSSION
 
 56
 A reduction in patent fees is available to an entity that qualifies as a "small business concern" in accordance with the Small Business Administration definition of such concern as an entity having less than 500 employees. 37 C.F.R. § 1.9(d). Lex has never had more than about twenty employees. The SBA regulations further qualify the definition of small business for patent fee purposes, by including the size of licensees in the calculation. 13 C.F.R. § 121.12(a). By the time Lex paid its second and third maintenance fees, Lex had granted non-exclusive licenses to entities having more than 500 employees. Lex learned of this taint on its maintenance fee payments when it was raised by Ulead in this litigation. Lex then paid the deficiency, in accordance with the procedure in the PTO Regulations:
 
 
 57
 37 C.F.R. § 1.28(c) How errors in small entity status are excused.
 
 
 58
 If status as a small entity is established in good faith, and fees as a small entity are paid in good faith, in any application or patent, and it is later discovered that such status as a small entity was established in error, or that through error the Office was not notified of a loss of entitlement to small entity status as required by § 1.27(g)(2), the error will be excused upon: compliance with the separate submission and itemization requirements of paragraphs (c)(1) and (c)(2) of this section, and the deficiency payment requirement of paragraph (c)(2) of this section.
 
 
 59
 In accordance with § 1.28(c), if small entity status was established in good faith, the error is excused when the deficiency is paid in compliance with the designated procedures. See also 37 C.F.R. § 1.28(d) ("Payment of deficiency operates as notification of loss of status."); D.H. Technology, Inc. v. Synergystex International, Inc., 154 F.3d 1333 & n. 4 (Fed.Cir.1998) (submission of the fee deficiency is treated as a representation of good faith); Changes to Patent Practice and Procedures, 62 Fed. Reg. at 53135, 53184 (Oct. 10, 1997) (submission of the fee deficiency is a representation that the original payment was made in good faith.) By this procedure, Lex's error was excused when the Director accepted the payment and compliance with § 1.28(c).
 
 
 60
 The panel majority acknowledges that the submission of the deficiency in the fee is a representation of good faith, as the regulations provide, and is not subject to judicial review Despite this concession that the patentee's good faith in making the reduced payment cannot be challenged, the majority then circumvents its own holding and rules that the question of bad faith may indeed be raised, by changing the question: "The question here is whether Lex committed inequitable conduct by knowingly misrepresenting that it was entitled to have the error excused." Maj. op at 1150. I marvel at the ingenuity whereby the majority accepts that the error is correctable without further inquiry when the requirements of § 1.28(c) are met, but then holds that inequitable conduct can arise by requesting the correction. The panel majority thus negates the regulatory provisions and the precedent that has applied them.
 
 
 61
 The term "inequitable conduct" is absent from the regulations. An amendment to 37 C.F.R. § 1.28 removed the reference to 37 C.F.R. § 1.56 from an earlier version; § 1.56 is the regulation directed to the duty to disclose information material to patentability, whose violation may be deemed inequitable conduct. It is clear from the regulatory history that underpayment of a fee as a small entity was not intended to be equated with the duty to disclose information material to patentability. Underpayment of a maintenance fee is not a matter of patentability, and is not so treated in the governing regulations and in precedent.
 
 
 62
 Lex was entitled to small entity status when it paid the first (fourth year) maintenance fee. The second (eighth year) maintenance fee was due February 27, 1993. Lex paid the fee late, in November 1993, paying the $935 fee for a small entity (half the regular rate) and the $1,500 surcharge for late payment. With its payment Lex submitted PTO form PTO/SB/10, entitled "Verified Statement Claiming Small Entity Status (37 C.F.R. 1.9(f) & 1.27(c))-Small Business Concern," from the Manual of Patent Examining Procedure § 509.03 (5th ed., rev. 14, 1992). The form stated in relevant part:
 
 
 63
 I hereby declare that the above identified small business concern qualifies as a small business concern as defined in 13 CFR 121.3-18, and reproduced in 37 CFR 1.9(d), for purposes of paying reduced fees under section 41(a) and (b) of Title 35, United States Code, in that the number of employees of the concern, including those of its affiliates, does not exceed 500 persons.... If the rights held by the above identified small business concern are not exclusive, each individual, concern or organization having rights to the invention is listed below and no rights to the invention are held by ... any concern which would not qualify as a small business concern under 37 CFR 1.9(d).
 
 
 64
 No other entity was listed as having "rights to the invention," although Lex had several non-exclusive licensees. The form was prepared by patent attorney Irving Weiner, and was signed by Simon Haberman as president. Lex was again late in paying the third (twelfth-year) maintenance fee, again accompanied by a small entity claim, signed by Mr. Weiner:
 
 
 65
 A verified statement establishing small entity status for this patent was filed November 2, 1993. It is confirmed that the small entity status for this patent has been checked and is still in effect.
 
 
 66
 The statement was accompanied by the small entity fee of $1,580 (half the regular rate) and the $1,640 surcharge for late payment.
 
 
 67
 When the issue arose in this litigation, Lex paid the deficiency in the maintenance fees, complying with the conditions set in 37 C.F.R. § 1.28(a) for excusing an erroneous claim of small entity status. See D.H. Technology, 154 F.3d at 1341-42 & n. 8 (erroneous payment of a shall entity fee can be corrected at any time). Ulead argued to the district court that the underpayment should not be excused, stating that Lex's sole purpose was to save money,[9] and that Lex's ignorance of the law or facts as to its small entity status is irrelevant.
 
 
 68
 Mr. Haberman testified, and it is not disputed, that Lex was a "small entity" under the Small Business Association definition and that it had small entity status for maintenance fee purposes during the first seven years of the patent's life. He testified that he did not recognize that this status was lost when Lex obtained a large entity as a non-exclusive licensee. He testified that he was familiar with the SBA definition of a small business concern, which was set forth in the PTO form, and that Lex then and now meets the SBA definition. He testified that he read the form before he signed it, but not the regulatory sections that were referenced only by number.
 
 
 69
 The PTO form, the relevant portion of which is shown ante, did not contain the text of the SBA regulation 13 C.F.R. § 121.12 that related to including the size of licensees for reduced fee purposes, but instead paraphrased and shortened it to say that if the rights that the entity possessed "are not exclusive," the applicant should list those "having rights in the invention." Mr. Haberman testified that Lex indeed possessed the exclusive rights. He stated that non-exclusive licensees do not have "rights in the invention." He said: "In my opinion, exclusive right is the right to control. And the licensees, by the very terms of the license, have no right to control the invention." Mr. Haberman, described as a real estate lawyer, drew an analogy to real property law, in explaining that non-exclusive licensees have no "rights in the invention." He testified:
 
 
 70
 But analogous to say, for example, real estate. If I license you to use this room for your deposition, I do not give you part of the building. I don't give you an interest in the building. And if you asked my opinion, that's the way I understand it. A license is something temporary that you're given to use. It's not part of the — you're not becoming my partner, you do not own part of the patent, you simply have a right, as explained in the patent, to use the art that is taught by the patent.
 
 
 71
 He testified that Lex was the only entity with "the right to prevent others from making a product that contained or was covered by the claims of the '188 patent."
 
 
 72
 Mr. Haberman's statement of the law of non-exclusive licenses cannot be faulted. A non-exclusive licensee does not have a property interest in the patent. See Spindelfabrik Suessen-Schurr v. Schubert & Salzer, 829 F.2d 1075, 1081 (Fed.Cir.1987) ("a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee"); Gilson v. Republic of Ireland, 787 F.2d 655, 658 (D.C.Cir.1986) ("It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent and that this personal right cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment.")
 
 
 73
 Lex points out that it underpaid the eighth year fee by $935, and the twelfth year fee by $1,580, and that it would not have jeopardized ten million dollars in royalty income for this saving in maintenance fees. Although Ulead argues that the mere fact that Lex saved money establishes both materiality and intent, and that the amount saved is irrelevant, a court need not reject common sense. See The Eliza Lines, 199 U.S. 119, 139, 26 S.Ct. 8, 50 L.Ed. 115 (1905) (Holmes, J.) (rejecting a position as "utterly opposed to common sense"); Stromberger v. 3M Co., 990 F.2d 974, 979 (7th Cir.1993) ("the scheme that Stromberger imputes without evidence to the company would have been Machiavellian, all right, but it would also have been stupid"). Common sense cannot reconcile Ulead's charge that Haberman deliberately misstated the status of Lex with deceptive intent, jeopardizing millions of dollars in royalties then being paid, for a saving of $935 in the second maintenance fee (exceeded by the late-payment penalty). And if attorney Weiner filed a deliberately false (as contrasted with negligent) statement in order to save his client $1,540 of the third maintenance fee (also exceeded by the late-payment penalty), such behavior is neither rational nor comprehensible.
 
 
 74
 When the issue is fraud, scienter is essential. See Lord v. Goddard, 54 U.S. 198, 202, 13 How. 198, 14 L.Ed. 111 (1851) ("[T]he action [of fraud] cannot be maintained without showing affirmatively knowledge of its falsity.") A knowing and intentional misrepresentation must always be present. See, e.g., Knauer v. United States, 328 U.S. 654, 657, 66 S.Ct. 1304, 90 L.Ed. 1500 (1942) ("Fraud connotes perjury, falsification, concealment, misrepresentation.") Contrary to the position of the panel majority, the history as well as the letter of the small entity fee regulations show that the regulatory intent was to apply the more rigorous law of fraud, not the more readily satisfied standards of inequitable conduct.
 
 
 75
 Although my colleagues state their recognition that the burden of proof of inequitable conduct is on the challenger, they appear to require Lex affirmatively to prove lack of intent to deceive, for Ulead did not make a prima facie showing of either fraud or inequitable conduct. I also observe that my colleagues presume the materiality prong of inequitable conduct, without discussion or analysis. However, it is a requirement of proof of inequitable conduct that both materiality and intent be established by clear and convincing evidence. The court's casual treatment of this hard-won precision disserves this jurisprudence.
 
 
 76
 In further departure from precedent, the panel majority holds, for the first time, that inequitable conduct and ensuing unenforceability can be based on actions after the patent has issued and unrelated to patentability. This too is contrary to established law, and raises an important principle, for it achieves forfeiture of vested property rights. In Aptix Corp. v. Quickturn Design Systems Inc., 269 F.3d 1369, 1376 (Fed.Cir.2001) the court observed that when the patent had not been procured by inequitable conduct in the PTO, "[n]o case law from the Supreme Court or this court provides a basis for nullifying property rights granted by the United States when such property rights did not themselves accrue through inequitable conduct." The panel majority now violates this precedent.
 
 
 77
 The record in promulgating § 1.28(d) shows the intent to avoid the kind of satellite litigation that the panel majority now imports into small entity fee cases. There was administrative and public concern that the small entity rules not become a ground of disproportionate controversy. See Changes in Patent Practice and Procedures, 62 Fed. Reg. 53,132, 53,135 (Oct. 10, 1997). Deference to PTO administration and procedures, required by the Administrative Procedure Act, Dickinson v. Zurko, 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999), requires that the Director's rules for acceptance of deficient payments be respected. This court improperly denies that deference when it not only removes the issue from the purview of the PTO Director, but also ignores that in this case the agency procedures were met.
 
 
 78
 It is a denial of not only precedent and regulation but also of the requisite administrative deference, in now requiring Lex to litigate in the district court the question of whether the Director can accept the deficiency payment. Principles of judicial deference require the presumption that the Director correctly interpreted the governing regulations and acted within his authority. See, e.g., Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); Kubota v. Shibuya, 999 F.2d 517, 520-21 (Fed.Cir.1993). The statute, regulations, and requisite agency deference do not accommodate de novo judicial determination of this administrative aspect. As discussed in Hyatt v. Boone, 146 F.3d 1348 (Fed.Cir.1998) "[a]ny technical deficiency in meeting the formal requirements of [a PTO rule concerning streamlined continuations] must be viewed in light of the agency's acceptance of the applications as in compliance with the Rule. Regularity of routine administrative procedures is presumed, and departure therefrom, should such have occurred, is not grounds of collateral attack." Id. at 1355.
 
 
 Conclusion
 
 
 79
 The regulations implement the recognized concern lest the small entity fee status spawn new grounds of dispute. Thus the regulations provide a simple administrative method of correcting errors in such status. The record reflects various purposes, such as easing the entry of small entities into the patent system without undue risk of technical violation, and the recognition of possible human error. At the time this fee concession was adopted the courts were experiencing the "absolute plague" of charges of inequitable conduct in "almost every major patent case," perhaps cautioning the regulators about additional fodder for that plague.
 
 
 80
 The regulations governing correction of a small entity fee underpayment are explicit, and were explicitly met by Lex. From my colleagues departure from regulation, law, and administrative practice, I respectfully dissent.
 
 IV
 CROSS APPEAL
 
 81
 I concur in the judgment on the cross appeal.
 
 
 
 Notes:
 
 
 [9]
 Ulead's attorney gave the district court a figure of $25,000 in saved fees for the nine video editing patents, an amount cited by the district court in its opinion. Ulead now concedes that this figure was incorrect, and that the total saving for all nine patents was $14,000