RADER, Circuit Judge.
Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. (collectively “Honeywell”) brought suit against Hamilton Sundstrand Corporation (“Sundstrand”) for infringement of claims 8, 10, 11, 19, and 23 of United States Patent No. 4,380,893 (“the '893 patent”) and claim 4 of Patent No. 4,428,194 (“the '194 patent”). Because “rewriting of de *1307 pendent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel,” this court vacated an earlier infringement verdict in favor of Honeywell and remanded to determine whether Honeywell could rebut the presumption of surrender under Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) (Festo VIII), remanded to 344 F.3d 1359 (Fed.Cir.2003) (en banc) (Festo IX). Honeywell Int’l Inc. v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1134 (Fed.Cir.2004) (en banc) (Honeywell II). On remand, the United States District Court for the District of Delaware barred Honeywell from asserting the doctrine of equivalents. Honeywell Int’l Inc. v. Hamilton Sundstrand Corp., No. 99-309, 2006 WL 2346446, *1, 2006 U.S. Dist. LEXIS 57030, at *2 (D.Del. Aug. 14, 2006) (Honeywell III)- Because Honeywell did not show that the alleged equivalent was unforeseeable at the time of the narrowing amendment or that the narrowing amendment bore no more than a tangential relation to the alleged equivalent, this court affirms.
I
The patents at issue claim technology to control airflow surge in auxiliary power units or “APUs.” An APU is a gas turbine engine often used in the tail end of aircraft. The APU generates electricity for the aircraft and includes a load compressor to supply compressed air for starting the aircraft’s main engines and for controlling the cabin’s environment during flight. Because APUs face rapidly changing demand levels for compressed air during flight, they must control against “surges.” A surge is an aerodynamic phenomenon, which occurs when airflow through the compressor is too low. In a surge condition, the airflow cannot exit the compressor. Instead, the airflow surges back into the compressor, potentially damaging the APU.
A surge control system maintains a minimum level of airflow through the compressor at all times. Conventional systems provided a wide safety margin by drawing more air than required into the compressor’s main air duct and venting the excess through a surge bleed valve. While effective, these prior art systems were inefficient. Honeywell’s patents claim a more efficient APU surge control system. Honeywell’s invention establishes a “set point” that represents the minimum flow to avoid surges. “Ambient air ... is drawn through a set of adjustable inlet guide vanes (TGV’).... ” '893 Patent col.3 11.64-65. The IGVs open and close like Venetian blinds and regulate the amount of ambient air drawn into the load compressor. The value of the set point is “a function of the position of said [IGVs].” Id. col.12 11.11-12. The invention regulates this set point by comparison to a “flow-related parameter” that measures airflow out of the compressor. Id. col.2 11. 48-54. “Thus a comparison is made between the actual flow conditions (represented by the flow-related parameter) and the desired flow conditions (represented by the set point).” Honeywell II, 370 F.3d at 1134. The invention generates an error signal if the airflow through the compressor is too low. In response to this signal, the inventive APU determines the proper setting of the surge bleed valve to prevent a build up of pressure and maintain sufficient airflow. '194 Patent col.2 11.12-20, 55-60.
The '194 patent issued from a divisional of the application that issued as the '893 patent. During prosecution of the '893 patent, to overcome a rejection under 35 U.S.C. § 121, the applicant separated the system claims from the method claims. The system claims issued in the '893 patent, and the method claims issued in the *1308 '194 patent. The independent claims on appeal are claims 8 and 19 of the '893 patent and claim 4 of the '194 patent. Each of these claims requires the APU to include IGVs, which are used by the surge control system. These independent claims were dependent claims 17, 35 and 51 in the original application that ultimately issued as the '863 patent. The original independent claims (application claims 16, 32 and 48) did not contain any reference to IGVs or any use of the position of these guide vanes in the surge control system. The United States Patent and Trademark Office rejected the original independent claims as obvious in light of the prior art, but allowed the dependent claims when rewritten into independent form. Claims 8 and 19 of the '893 patent state:
8. A gas turbine engine accessory power unit having a fluctuating compressed air supply demand, said accessory power unit comprising:
(a) a compressor having adjustable inlet guide vanes;
(b) duct means for receiving compressed air discharged from said compressor and supplying the received air to the pneumatically-powered apparatus;
(c) surge bleed means operable to exhaust from said duct means a selectively variable quantity of air to assure at least a predetermined minimum flow rate through said duct means and thereby prevent surge of said compressor;
(d) sensing means for sensing the value of a predetermined, flow-related parameter within said duct means and generating an output signal indicative of said value, said value of said flow-related parameter being substantially independent of the temperature of the compressed air;
(e) comparator means for receiving said sensing means output signal and generating an error signal representing the difference between the sensed value of said parameter and a desired value thereof, said comparator means having an adjustable control set point representing said desired value of said parameter;
(f) means for transmitting to said comparator means a reset signal for varying said set point as a function of the position of said inlet guide vanes in accordance with a predetermined reset schedule; and
(g) control means for receiving said error signal and transmitting to said surge bleed means a control signal to operate said surge bleed means, the magnitude of said control signal having, relative to the magnitude of said error signal, a proportional component and an integral component, whereby said minimum flow rate through said duct means is essentially constant regardless of the compressed air supply demand of the pneumatically-powered apparatus.
’893 Patent col.ll 1.52-col.l2 1.23 (emphases added).
19. A control system for assuring a substantially constant minimum flow rate through a duct receiving air discharged from a compressor or the like having adjustable inlet guide vanes, the duct having a supply outlet connected to pneumatically-operated apparatus having a variable supply air demand, the duct further having an exhaust outlet, said control system comprising:
(a) a flow regulating device adapted to be positioned in the exhaust outlet and operable to selectively vary air flow outwardly therethrough;
(b) a sensing device having a sensing portion adapted to be positioned in the duct to sense therein a predeter *1309 mined parameter related to the air flow rate through the duct, said sensing device further having an output portion;
(c) an adjustable set point comparator having an input portion coupled to said output portion of said sensing device, and an outlet adapted to generate an error signal;
(d) a proportional controller having an inlet coupled to said output of said comparator and further having an outlet;
(e) an integral controller having an inlet coupled to said outlet of said comparator and further having an outlet;
(f) a summer having a first inlet coupled to said outlet of said proportional controller, a second inlet coupled to said outlet of said integral controller, and an outlet coupled to said flow regulating device; and
(g) a guide vane position sensor and a function generator coupled in series between the inlet guide vanes and said input portion of said comparator.
Id. col. 4 1.62-col. 16 1.22 (emphases added).
Claim 4 of the '194 patent states:
4. A method of utilizing a compressor of a gas turbine engine to power pneumatically-operated apparatus having a variable inlet air flow demand, the compressor having adjustable inlet guide vanes, said method comprising the steps of:
(a) interconnecting a supply duct between the compressor and the pneumatically-operated apparatus;
(b) flowing discharge air from the compressor through said supply duct to the pneumatically-operated apparatus;
(c) maintaining an essentially constant minimum supply duct flow rate, despite fluctuations in the flow rate of air received by the pneumatically-operated apparatus, by exhausting air from said supply duct in response to variations therein of the value of a predetermined, flow-related parameter, the flow rate of air exhausted from said supply duct being related to the magnitude of said parameter value variations in both a proportional and time-integral manner, said maintaining step including the steps of providing an outlet passage from said supply duct, positioning in said outlet passage a surge bleed valve operable to selectively vary the flow of air outwardly through said outlet passage, generating an integral control signal in response to said variation in said flow-related parameter, generating a proportional control signal in response to said variations in said flow-related parameter, and simultaneously utilizing said integral and proportional control signals to operate said surge bleed valve; and

(d)adjusting the relationship between the magnitudes of said integral and proportional control signals and the magnitudes of said parameter variations as a function of the position of the inlet guide vanes.

’194 Patent col. 10 1.64-col. 12 1.16 (emphases added).
Sundstrand manufactures the APS 3200, an APU device with a surge control system that compares a flow-related parameter called DELPQP to a set point based on air inlet temperature and adjusts the surge bleed valve in response. DELPQP is an acronym for delta P over (quotient) P and measures pressure differentials as a proxy for airflow. At high flow levels, DELPQP can lead to an ambiguous signal, where DELPQP becomes inversely proportional to the amount of flow. The ambiguous signal may cause the system to *1310 open the surge bleed valve unnecessarily to increase flow. This incorrect reading issue is known as the double solution or inverted-V problem. The APS 3200 solves this problem by blocking the control signal during high-flow conditions. The system uses in part IGV position to determine whether the APU is experiencing high flow or low flow, and consequently whether to block the control signal.
Honeywell filed suit on May 17, 1999 alleging that Sundstrand’s APS 3200 infringed claims of three of its patents, including the '893 and '194 patents. Sundst-rand filed a motion for partial summary judgment to limit damages to those incurred after February 3, 1999, the date it received actual notice of Honeywell’s infringement allegations, because Honeywell did not mark its product under 35 U.S.C. § 287(a). Honeywell conceded that it did not mark its product with the '893 patent, but argued that the '194 method claim patent did not permit or require marking. The district court disagreed, granting partial summary judgment and holding that because both patents refer to the same tangible product, Honeywell could and should have marked the product. Honeywell Int’l Inc. v. Hamilton Sundstrand Corp., No 99-309, 2001 WL 66345, at *3-4 (D.Del. Jan.4, 2001). The district court also held that Honeywell could not recover damages for sales entered into before to February 3, 1999, even if delivery occurred thereafter. Honeywell Int’l Inc. v. Hamilton Sundstrand Corp., No. 99-309 (D.Del. Feb. 8, 2001).
On February 16, 2001, a jury found that Sundstand infringed claims of the '893 and '194 patents under the doctrine of the equivalents. Honeywell Int’l Inc. v. Hamilton Sundstrand Corp., 166 F.Supp.2d 1008, 1013-14 (D.Del.2001) (Honeywell I). The jury further found that Honeywell was entitled to $45,000,000 in price erosion damages and $1,578,065 in reasonable royalty damages. Id. at 1014. The district court denied Sundstrand motions for judgment as a matter of law (“JMOL”) and a new trial. Honeywell II, 370 F.3d at 1138. Both parties appealed. On February 5, 2004, this court, sua sponte, ordered that the case would be resolved en banc, without further arguments from the parties. Id. at 1139. The court held that Honeywell’s act of “rewriting [the] dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel.” Id. at 1134. Thus, the court vacated the judgment of infringement and remanded the case for the “determination of whether Honeywell [could] rebut the presumption....” Id.
On remand, the district court held a two-day bench trial to determine whether prosecution history estoppel barred Honeywell from asserting the doctrine of the equivalents. Honeywell III, 2006 WL 2346446, *1, 2006 U.S. Dist. LEXIS 57030, at *2. The parties contested the definition of the alleged equivalent element. In reaching its decision, the district court adopted Honeywell’s articulation: “the Sundstrand APS 3200 surge control system with its unique DELPQP flow-related parameter and its particular use of the inlet guide vane position as part of the high-flow logic that that parameter occasioned.” Id., 2006 WL 2346446, **4-5, 2006 U.S. Dist. LEXIS 57030 at *13-14. The district court correctly stated that Honeywell could rebut the presumption of surrender by demonstrating that (1) “the alleged equivalent would have been unforeseeable at the time of the narrowing amendment,” or (2) “the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question,” or (3) “that there was ‘some other reason’ suggesting that the patentee could not reasonably have been expected to have described the al *1311 leged equivalent.” Id., 2006 WL 2346446, *5, 2006 U.S. Dist. LEXIS 57030 at *14 (quoting Festo IX, 344 F.3d at 1369).
Honeywell conceded the “some other reason” criterion. Honeywell Int’l Inc. v. Hamilton Sunstrand Corp., No 99-309, 2006 WL 2346446 (D.Del. Aug.14, 2006). Thus, the district court focused on tangen-tiality and foreseeability. Because the parties agreed that the tangentiality inquiry should be decided solely on the prosecution history, the parties presented evidence at the bench-trial only on the issue of foreseeability. Honeywell argued that in the 1982-83 timeframe — which the parties agreed is the relevant period — the use of DELPQP and IGV position to detect surge was unforeseeable. Sundstrand argued that an APU developed in the late 1970’s, the L1011, also measured a static pressure differential to avoid the double solution problem experienced by the APS 3200.
The L1011, however, distinguished between high flow and low flow through the use of a shock switch, rather than through IGV position. Supersonic speeds activated the shock switch, which caused the system to ignore the control signal and maintain the valves in their high flow position. These differences aside, the district court held that it was “quite intuitive” that it was foreseeable, in 1982-83, to one skilled in the art to measure the position of IGVs to distinguish between high flow and low flow. Id., 2006 WL 2346446, *6, 2006 U.S. Dist. LEXIS 57030 at *17. The district court recognized that both parties presented sufficient evidence to support their respective positions, but opined that the resolution was not a close call. Id., 2006 WL 2346446, *6 n. 2, 2006 U.S. Dist. LEXIS 57030 at. *17 n. 2.
Turning to the tangential relation prong, the district court noted that the focus of this inquiry is on “the patentee’s objectively apparent reason for the narrowing amendment.” Id., 2006 WL 2346446, *6, 2006 U.S. Dist. LEXIS 57030 at *19 (citing Festo IX, 344 F.3d at 1369). Honeywell argued that the reason for the underlying amendment was to overcome prior art that disclosed a surge control system with P and Delta P sensors and proportional and integral control, and that had nothing to do with IGVs. The district court disagreed with this characterization, as the DELPQP is a parameter that is also calculated by measuring P and Delta P. Thus, both the prior art and the equivalent in question involved the same flow-related measurement and the use of that measurement is directly related to the rationale underlying the amendments. Therefore, Honeywell did not rebut the presumption with the tangential relation prong. Id., 2006 WL 2346446, **8-9, 2006 U.S. Dist. LEXIS 57030 at *24-26.
Honeywell filed a timely appeal, asserting that it had rebutted the presumption of prosecution history estoppel under the foreseeability and tangential relation criteria. Honeywell also appeals the district court’s pre-trial rulings limiting its damages claim under the method-only '194 patent and excluding from recovery reasonable royalties resulting from sales contracts entered before the notice letter date. Sundstrand argues that even if Honeywell is not estopped from alleging infringement under the doctrine of equivalents, the jury’s verdict lacks sufficient support from trial evidence. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).
II
“Prosecution history estoppel is a legal question subject to de novo review on appeal.” Cybor Corp. v. FAS Techns. Inc., 138 F.3d 1448, 1460 (Fed.Cir.1998) (en banc). This court, however, reviews any factual issues underlying the inquiry for *1312 clear error. See Festo IX, 344 F.3d at 1369-70. This court reviews a district court’s denial of a motion for JMOL de novo, applying the JMOL standard used by the district court. Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1375 (Fed.Cir.2001). JMOL is appropriate when “there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.” Fed.R.Civ.P. 50(a)(1). This court also reviews a district court’s grant of summary judgment without deference. Monsanto Co. v. Scruggs, 459 F.3d 1328, 1334 (Fed.Cir.2006).
Under the doctrine of the equivalents, “a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is ‘equivalence’ between the elements of the accused product or process and the claimed elements of the patented invention.” Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). The doctrine of prosecution history estoppel prevents a patent owner from recapturing with the doctrine of equivalents subject matter surrendered to acquire the patent. See Festo IX, 344 F.3d at 1365 (citing Festo VIII, 535 U.S. at 741, 122 S.Ct. 1831).
Because the three asserted independent claims were rewritten from dependent form and because the original independent claims were cancelled, there is a presumption of prosecution history estoppel. See Honeywell II, 370 F.3d at 1134. Nonetheless Honeywell may rebut that presumption with a showing that: (1) “the alleged equivalent would have been unforeseeable at the time of the narrowing amendment” or (2) “the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question.” Festo IX, 344 F.3d at 1369 (quoting Festo VIII, 535 U.S. at 741, 122 S.Ct. 1831).
A. Foreseeability
On remand from the Supreme Court in Festo, this court explained that the foreseeability criterion
presents an objective inquiry, asking whether the alleged equivalent would have been unforeseeable to one of ordinary skill in the art at the time of the amendment. Usually, if the alleged equivalent represents later-developed technology (e.g., transistors in relation to vacuum tubes, or Velcro (R) in relation to fasteners) or technology that was not known in the relevant art, then it would not have been foreseeable. In contrast, old technology, while not always foreseeable, would more likely have been foreseeable. Indeed, if the alleged equivalent were known in the prior art in the field of the invention, it certainly should have been foreseeable at the time of the amendment. By its very nature, objective unforeseeability depends on underlying factual issues relating to, for example, the state of the art and the understanding of a hypothetical person of ordinary skill in the art at the time of the amendment. Therefore, in determining whether an alleged equivalent would have been unforeseeable, a district court may hear expert testimony and consider other extrinsic evidence relating to the relevant factual inquiries.
Id. at 1369 (citation omitted). Subsequently, we clarified that “[a]n equivalent is foreseeable if one skilled in the art would have known that the alternative existed in the field of art as defined by the original claim scope, even if the suitability of the alternative for the particular purposes de *1313 fined by the amended claim scope were unknown.” Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 493 F.3d 1368, 1382 (Fed.Cir.2007) (Festo X).
The principle of foreseeability ties patent enforcement appropriately to patent acquisition. In making this connection, foreseeability reconciles the preeminent notice function of patent claims with the protective function of the doctrine of equivalents. Thus, foreseeability in this context ensures that the doctrine does not capture subject matter that the patent drafter could have foreseen during prosecution and included in the claims. The goal of the principle is to ensure that the claims continue to define patent scope in all foreseeable circumstances, while protecting patent owners against insubstantial variations from a claimed element in unforeseeable circumstances. The foreseeability principle thus relegates the doctrine of equivalents to its appropriate exceptional place in patent enforcement.
To maintain consistency, a court must use the same definition of the equivalent to evaluate both foreseeability and infringement. As we explained in Festo X, adoption of different equivalents for infringement and foreseeability would produce perverse results. Id. at 1381. Under such a paradigm, patentees and accused infring-ers would reverse roles when arguing whether the equivalent met the test for infringement on the one hand, and foreseeability, on the other. Id. In this instance, the district court found that even the narrow equivalent proposed by Honeywell was foreseeable and thus precluded by es-toppel principles. We agree.
To evaluate whether Honeywell can overcome the presumption of surrender, like the district court, this court assumes that Honeywell’s proposed articulation of the equivalent element is correct: “the use of (1) a static pressure differential (i.e., DELPQP), which can be indicative of surge only if the APU is experiencing low flow, in combination with (2) IGV position, which is indicative of whether the APU is experiencing low flow or high flow, to detect surge.” Honeywell III, 2006 WL 2346446, **4-5, 2006 U.S. Dist. LEXIS 57030, at *13-14.
This court must examine, on the basis of this record, whether the use of IGV position to detect high flow and low flow was later-developed technology and thus unforeseeable at the time of the amendments during the prosecution process. The timing of Sundstrand’s product development does not settle the issue. The record shows that Sundstrand developed its equivalent between 1991 and 1995, after the relevant amendments in 1982-83. The mere temporal relationship of the equivalent to the patent acquisition and amendment process, however, does not make the equivalent unforeseeable. The record shows that Sundstrand began using IGV position to control airflow within two months of observing the double solution problem, which suggests that the IGV solution may have been known (and foreseeable) in the art. The record also shows that Sundstrand refined this way of addressing the problem over the next four years — evidence susceptible to characterization as either showing difficulty in reaching the ultimate solution or showing the natural and foreseeable application of well-known principles.
However, Honeywell contends that the district court’s determination was clearly erroneous because in the 1982-83 time frame surge control systems did not use inlet guide vane position to ascertain the existence of high or low flow situations for surge control. Honeywell is correct that the systems in the 1982-83 time period did not use inlet guide vane position for this purpose, but it was known that the control of surge was important; that systems, *1314 such as the L1011 system, had been developed for that purpose; and that inlet guide vanes were routinely used in surge control systems and affected the air flow rate. For example, U.S. Patent No. 4,164,035 (“the Glennon patent”), issued in 1979, claims a surge control system and teaches that IGV position affects airflow rate. Honeywell’s expert, Mr. Muller, also testified:
Q: In fact, going back to the 1970s, it was Honeywell’s understanding that in order to efficiently control surge, you would need to take into account inlet guide vane angle and input into your surge control system. Correct?
A: Well, by using this information you can incrementally improve the operation of a surge controller, yes.
The record also shows no technical barrier to the use of IGV position to determine air flow, as Honeywell’s corporate representative, James Clark, admitted. He confirmed that Honeywell “could have [] solved [the double solution problem] using inlet guide vane position” in the 1970s. Foreseeability does not require that the accused infringing product or process be foreseeable, nor that any equivalent exist at the time; rather foreseeability only requires that one of ordinary skill in the art would have reasonably foreseen the proposed equivalent at the pertinent time. Festo X, 493 F.3d at 1382. Sunstrand’s expert, Dr. Japiksi, whom the district court found to be credible, concluded that it was “known or foreseeable to a person of ordinary skill in the art in 1982 to use IGV position to determine whether the flow was high or low.” Based on this testimony and the record evidence described above, the district court concluded that “measuring IGV position ... is a reasonably obvious way — both at present and in 1982-83 — to determine whether the APU is experiencing high flow or low flow.” Honeywell III, 2006 WL 2346446, *6, 2006 U.S. Dist LEXIS 57030, at *17. This court finds no clear error in the district court’s conclusion.
While both parties presented expert witnesses, the district court determined, after observing the witnesses’ demeanor and credibility, that the resolution was not close. Id., 2006 WL 2346446, *6, 2006 U.S. Dist. LEXIS 57030 at *17 n. 2. The Supreme Court has instructed: “[W]hen a trial judge’s finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.” Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); The Am. Original Corp. v. Jenkins Food Corp., 774 F.2d 459, 462 (Fed.Cir.1985). As discussed above, while the timing of Sundstram’s product development is ambiguous with respect to the foreseeability criterion, much of the extrinsic evidence — most notably several prior art references in the record — supports the district court’s decision.
Thus, the record supports the district court’s finding that a person of ordinary skill in the art would have known of the use of IGV position to distinguish between high and low flow in order to resolve the double solution problem during 1982-83. Honeywell could have foreseen and included the alleged equivalent in the claims when they were amended. As a result, Honeywell did not rebut the presumption of surrender with evidence of unforesee-ability.
This court also discerns no fatal error in connection with Federal Rule of Civil Procedure 52. This court perceives that the trial court did not offend the requirement to “find the facts specially.” Fed.R.Civ.P. 52; Consolidated Aluminum Corp. v. Foseco Int’l Ltd., 910 F.2d 804, 814 (Fed.Cir. *1315 1990) (“A remand ... in a case thought to be completed, is a step not lightly taken .... ”) Indeed, this court need only remand when it has “no way ... to affirm or reverse the district court’s action under review.” Id. Because, as noted above, the record supplies sufficient evidence to affirm the district court’s action, this court does not venture to apply rule 52 strictly. See id. (“An appellate court need not close its eyes to the record where ... there is a way clearly open to affirm the district court’s action.”); see also, Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1370 (Fed.Cir.2004).
This court also perceives no fatal error in the trial court’s refusal to estop Sundstrand from reversing its prior position that the APS 3200 surge control system and its particular use of IGV position was unique (and perhaps unforeseeable). “Judicial estoppel applies when a party takes a later position that is inconsistent with a former position in the same dispute, on which the party had been successful and had prevailed based on the former position.” Bonzel v. Pfizer, Inc., 439 F.3d 1358, 1362 (Fed.Cir.2006). In the first place, it is not apparent that Sundstrand prevailed on any issue because of its alleged inconsistent position. Sundstrand did avoid a finding of literal infringement of claim 4 of the '194 patent and avoided enhanced damages despite the jury’s determination of willful infringement. These putative victories, however, are difficult to link to Sundstrand’s characterization of its product as unique. Indeed, the district court found that substantial evidence would have permitted a reasonable jury to conclude that the APS 3200 did not literally infringe elements 4(c) and 4(d) of the '194 patent because the APS 3200 did not literally infringe the flow-related parameter and did not use the IGV position in the same manner as described in those sections. Honeywell I, 166 F.Supp.2d at 1018-19. Moreover, the district court declined to enhance damages because “there was little direct evidence which evinced the sort of culpable mindset that would make enhanced damages appropriate.” Id. at 1040. Because the record does not link Sundstrand’s success on these issues to its argument that its surge control system was unique, judicial estoppel does not apply. If any party was estopped, it was Honeywell, which, as noted above, apparently established infringement using a broader definition of the equivalent than it now urges with respect to the foreseeability issue.
In sum, this court does not discern any error in the .district court’s judgment that Honeywell did not rebut the presumption of prosecution history estoppel with evidence of unforeseeability.
B. Tangential Relation
The tangential relation criterion for overcoming the Festo presumption is very narrow. Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 480 F.3d 1335, 1342 (Fed.Cir.2007). As this court provided in its Festo IX opinion on remand from the Supreme Court, the tangential relation criterion focuses on the “patentee’s objectively apparent reason for the narrowing amendment.” 344 F.3d at 1369. To rebut the estoppel presumption with tangentiality, a patentee must “demonstrate that the rationale underlying the amendment bore no more than a tangential relation to the equivalent in question,” or, in other words, that “the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent.” Id. (citation omitted). Additionally, the reason for the narrowing amendment “should be discernible from the prosecution history record....” Id. If the prosecution history reveals no reason for the narrowing amendment, the presumption is not rebutted. See id. at 1371-72 (the patentee did *1316 not rebut because the prosecution history revealed no reason for the amendment). Silence does not overcome the presumption.
The record shows that the examiner simply instructed that the dependent claims would be allowed if rewritten into independent form. Those instructions, however, must be placed in their proper context. As this court explained in Festo IX, “whether an amendment was merely tangential to an alleged equivalent necessarily requires focus on the context in which the amendment was made.... ” 344 F.3d at 1370. The original independent claims disclosed a surge control system with P and delta P sensors and proportional and integral controls. Those claims, however, were rejected as obvious in light of the prior art. The original dependent claims were then rewritten into independent form and incorporated the limitations of the rejected independent claims. Therefore, the key to this inquiry is the content of the original dependent claims.[1] Those claims included the IGV limitation, which “refers to both the claimed structure of the [IGVs] and their claimed function in the surge control system.... ” Honeywell II, 370 F.3d at 1137 n. 2. Accordingly, when Honeywell rewrote the application dependent claims into independent form, it “effectively add[ed] the [IGV] limitation to the claimed invention.” Id. at 1144. Thus, the record shows that Honeywell made the amendment to add the IGV limitation. Because the alleged equivalent focuses on the IGV limitation, the amendment bore a direct, not merely tangential, relation to the equivalent. Tangentiality does not help Honeywell overcome the presumption of surrender.
Because the record does not rebut the prosecution history estoppel presumption, Honeywell’s challenges to the district court’s rulings with respect to whether damages should be limited and whether the evidence is sufficient to support the jury’s infringement verdict are moot.
IV
For the reasons stated herein, the court holds that Honeywell has failed to rebut the presumption of surrender, and is therefore barred by prosecution history estoppel from asserting the doctrine of equivalents. This court affirms the judgment of the district court.

AFFIRMED

COSTS

Each party shall bear its own costs.
*1317 Opinion for the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge NEWMAN.

. Claims 17, 35, and 51 of the application that issued as the '893 provided:
17. The accessory power unit of Claim 16 wherein said compressor has adjustable inlet guide vanes, the value of said flow-related parameter is substantially independent of tire temperature of the compressed air, said comparator means have an adjustable control set point representing said desired value of said parameter, and said accessory power unit further comprises means for transmitting to said comparator a reset signal for varying said set point as a function of the position of said inlet guide vanes in accordance with a predetermined reset schedule.
35. The control system of Claim 32 wherein the compressor has adjustable inlet guide vanes, and said control system further comprises a guide vane position sensor and a function generator coupled in series between the inlet guide vanes and said input portion of said comparator.
51. The method of Claim 49 wherein the compressor has adjustable inlet guide vanes, and said method further comprises the step of adjusting the relationship between the magnitudes of said integral and proportional control signals and the magnitudes of said parameter variations as a function of the position of the inlet guide vanes.